UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| ) | |
| v. ) | No. 2:19-cr-00063-LEW |
| ) | |
| KEVIN BARNER ) | |

## EMERGENCY MOTION TO RE-OPEN HIS DETENTION HEARING

Kevin Barner, the defendant, respectfully moves this Court, on an emergency basis and pursuant to 18 U.S.C. § 3142, to re-open his detention hearing and to release him on conditions pending his trial in this matter. The Government objects.

Mr. Barner is charged with possession with intent to distribute cocaine base. On November 30, 2018, the car Mr. Barner was riding in was pulled over on the Maine Turnpike. After a series of events outlined in the government's discovery, Mr. Barner allegedly admitted he was concealing drugs within his body. After turning these drugs over to law enforcement officers, Mr. Barner was released by with a summons to return to Maine for an arraignment. At the time of his release, law enforcement officers knew Mr. Barner did not live in Maine and knew the quantity of the alleged drugs Mr. Barner had in his possession.

Six months later, on May 2, 2019, Mr. Barner was arrested in New York, where he lives, outside the home he shares with his mother. On June 12, 2019, the Court held an initial appearance in Maine. At that hearing undersigned counsel was appointed, the detention hearing was waived, and a not guilty plea was entered. The Court held Mr. Barner pending trial. Mr. Barner is detained at the Strafford County Department of Correction in Dover, New Hampshire ("jail").

Mr. Barner now seeks a review of his Detention Order.

Mr. Barner is fifty-four years old and suffers from a variety of health issues. Most troubling, considering our current pandemic, is his severe asthma. He is prescribed three different types of inhalers. In total, Mr. Barner is prescribed the following medications for his health issues:

- Prilosec (40 mg twice a day)
- Claritin (10 mg daily)
- Remeron (30 mg every night)
- Prozac (20 mg daily)
- Tylenol (twice daily)
- Flonase (daily)
- Meloxicam (15 mg daily)
- Albuterol inhaler (rescue inhaler)
- Advair inhaler (500/50 one puff twice daily)
- Spiriva inhaler (one puff daily) (see attached document from the jail)

Mr. Barner's body is susceptible to illness. COVID-19 is highly contagious. The Center for Disease Control and Prevention ("CDC") issued guidance discouraging gatherings of more than ten people in any given location. The CDC also urges social distancing requiring that every person should remain at a distance of at least six feet from every other person. Schools, businesses, government buildings, and even courts have either shut down or restricted access to limited personnel in order to contain the spread of the virus. These are unprecedented times.

Individuals confined to jails are at high risk of infection because COVID-19 is highly contagious and detention facilities create a higher risk of transmission. Jails confine person in close proximity and with shared facilities. Thus, jails are ill equipped to prevent a virus' transmission and COVID-19 is a highly infectious disease. Additionally, jails are not equipped to isolate inmates from each other or staff. Staff are returning to work after being in a community where the virus exists. The virus' long incubation period means it is not medically possible to determine if a staff member is infected before she/he enters the jail. This situation increases the risk that the virus will be transmitted to the inmates. To further illustrate the risks of exposure to COVID-19 for those confined in jails are the statements of two public health experts Lani Graham, MD MPH and Sharon McDonnell, MD MPH. These statements were previously submitted alongside an ACLU and MACDL letter to the Chiefs of the Maine Supreme Judicial Court, Superior Court, and District Court.

Beyond the humane arguments supporting release, Mr. Barner's ability to prepare his defense has been impacted by the virus. The jail has suspended all attorney visits. The only means of communication with his attorney is via mail or on a phone which is located in the middle of the pod and without the opportunity for confidential communication. This safety measure put in place because of the virus is inhibiting Mr. Barner's effective preparation of his defense. *See United*

*States v. Persico*, No. 84-cr-809 (JFK), 1986 WL 3793, at *1 (S.D.N.Y. Mar. 27, 1986) (describing cases in which temporary releases of defendants therein were granted prior to trial in order to facilitate the defendants' expeditious preparation for trial and thus to promote the prompt disposition of the charges against each defendant" where "[t]he concern in each case was that, given the admittedly limited access to telephones and attorney conference rooms at the detention facilities, the effective preparation of a defense might have been impossible in the short time available before the commencement of trial").

Circumstances have changed since Mr. Barner waived his right to detention. Nothing right now is normal. As a direct result of his vulnerable heath and incarceration Mr. Barner is suffering and he is scared of getting the virus.

Mr. Barner has lived a hard life. The Court will clearly see from his past convictions that he struggles with addiction. This case as alleged is based upon Mr. Barner transporting drugs inside his body from New York to Maine. Nevertheless, even after his detention in November of 2018, Mr. Barner was released. Law enforcement summoned him for a later court date. Mr. Barner left Maine and went home to his apartment that he shares with his mother. The Government waited six months to arrest him. When the government issued an arrest warrant for Mr. Barner law enforcement found him on his street outside his home. Mr. Barner is not a flight risk because he has nowhere to go other than his mother's home. And while the Government will now assert Mr. Barner is a danger to the community because of these drugs, it was a government actor who released him which belies the argument that Mr. Barner is a threat.

Mr. Barner understands that asking to go home to New York might seem counterintuitive. But home is home. Moreover, Mr. Barner can be isolated at his home and he would not have to rely upon a government actor to keep him safe—particularly in a crowded jail where it is all but impossible to do so. Mr. Barner can be in the apartment with his mom and comply with the current requirements in that State and remain safe. In the jail, he is powerless to ensure his own health. *See Estelle v. Gamble*, 429 US 97, 103-04 (1976) ("[I]t is but just that the public be required to care for the prisoner, who cannot, by reason of the deprivation of his liberty, care for himself.") (citation omitted). Mr. Barner seeks pretrial release.

WHEREFORE, Mr. Barner respectfully requests that this Honorable Court schedule a hearing to reopen his detention hearing.

Dated at Portland, Maine this 10th of April, 2020

_____/s/_____

Sarah E. Branch

Counsel for Kevin Barner

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MAINE**

Certificate of Service

I hereby certify that on April 10, 2020, I filed the foregoing Emergency Motion to Reopen his Detention hearing using the Court's CM/ECF system, which will cause a copy of the motion to be sent to all counsel of record

/s/ Sarah E. Branch
Counsel for Kevin Barner

# STRAFFORD COUNTY DEPARTMENT OF CORRECTIONS

## SICK CALL REQUEST:

NAME: Kevin Barner  DATE: 4/1/20

INMATE # 19-02240  DATE OF BIRTH 1-25-66  UNIT/CELL G/20

1) MEDICAL ☑  2) MENTAL HEALTH ☐  3) MEDS ☑  4) DETOX ☐  5) DENTAL ☐  6) QUESTION ☐ or RESPONSE ☐

PLEASE ONLY ADDRESS ONLY ONE OF THE ABOVE ISSUES-PER SICK SLIP REQUEST

### INCLUDE BELOW INFO THAT RELATES TO CORRESPONDING ISSUE NOTED ABOVE 1-5

1) **MEDICAL**: CONCERN or NEED, SYMPTOMS, WHEN IT BEGAN or OCCURS, PRIOR DIAGNOSIS, SURGERY/TREATMENT, INJURY, DESCRIBE PAIN/FEVER.
2) **MH**: ISSUE TO DISCUSS or SYMPTOMS→ WHEN BEGAN, PRIOR DIAGNOSES & HOSPITALIZATIONS, CURRENT SAFETY CONCERNS/PRIOR SAFETY ISSUES.
3) **MEDS**: MED & DOSAGE REQUESTING (previously prescribed?), REASON FOR MED, ANY SIDE EFFECTS, EFFECTIVENESS? WHO PRESCRIBED, LAST FILLED?
4) **DETOX**: LAST USE OF SUBSTANCES & ALCOHOL, AMOUNT USED & HOW OFTEN, PAST SEIZURES WHEN DETOXING, CURRENT PHYSICAL SYMPTOMS.
5) **DENTAL**: DESCRIBE SPECIFIC DENTAL PROBLEM. DENTIST DOES NOT DO CLEANINGS OR EXAMS, ONLY TEMPORARY FILLINGS & EXTRACTIONS.

Can you please send me any and all names of the medications that I took both in the past and the present I would be very grateful and appreciative

Thank you for your time

**Inmate Signature**
Kevin Barner

**RESPONSE FROM MEDICAL STAFF:**  DATE RECEIVED IN MEDICAL: _____

Complete ROI: return to Medical ☐  Request not approved ☐  Service/medication not provided ☐  Further assessment needed ☐
Request/need is available on Commissary ☐  Protocol for _____ started ☐  Recently met w/provider on _____ ☐
Not compliant w/current med ordered ☐: _____ for _____ Fully comply as ordered & f/u as needed ☐
Placed on: _____ provider list ☐  More info needed re. request: see below & provide info/answer to question ☐

1) Prilosec 40mg twice daily
2) Claritin 10mg daily
3) Remeron 30mg every night
4) Prozac 20mg daily
5) Tylenol 1gm twice daily
6) Flonase daily
7) Meloxicam 15mg daily
8) Albuterol inhaler (Rescue inhaler)
9) Advair inhaler 500/50 2 puffs twice
10) Spiriva inhale 1 puff daily

**Staff Signature** Nicole  **Date** 04/01/2020

Past meds  many btws
antibiotics  Claritin Benadryl
Amoxicillin  Pepcid
Keflex

Flovent inhaler
Remeron 15mg
Zoloft 50mg/100mg

## STATEMENT OF LANI GRAHAM, MD MPH

As a physician and expert in public health, I write to ask the Court to give serious consideration to taking immediate action to address the challenges posed by jails and prison as Maine struggles to control the COVID-19 virus. We cannot protect our community unless we protect *all* members and look closely at all settings. At times like this with so many challenges before us, it is all too easy to turn our backs on those who are incarcerated and "hope for the best". This would be a serious mistake and can only result in more misery. We health professionals must depend on you to develop solutions that take into account what we already know about the dangers posed by correctional facilities and how that spills over into Maine communities. As you weigh these options, I ask you to consider the following medical facts:

- COVID-19 has already shown us in multiple settings that prisons and jails are where the worst outbreaks occur—South Korea, our model of a good public health approach, had its worst outbreak in a prison hospital (107 infected and 7 died). And many states are seeing how impossible it is to contain this virus in a prison setting—New York and Massachusetts.
- Large numbers of inmates in all United States prisons, including Maine, are ill with mental health problems or substance use disorders. Must they be kept from treatment *and* infected with a lethal virus?

- Inmates, of course, present a high risk to those caring for them—the staff, both medical and non-medical. These folks go in and out of facilities, perhaps taking the virus home to vulnerable family and their community at large. I understand that in some places in Maine where the virus has a foothold, significant percentages of staff are already ill.
- We must protect health professionals who are working the front lines in this conflict. They do not need an influx of ill inmates to add to their burden.

It is crucial to reduce as much as possible the number of inmates in Maine jails and prisons, enabling people to perform social distancing and to access healthcare resources in the community. In this our 200th year, let's lead the nation in good sense and creativity as we face together this terrible pandemic.

Thank you for your consideration and please feel free to contact me if you think I can help.

Sincerely,

Lani Graham, MD MPH

## STATEMENT OF SHARON MCDONNELL, MD MPH

I am a physician with board certification in Public Health and Epidemiology and I am moved to offer my expertise and concern about the risks posed by prisons and jails in the COVID-19 pandemic. By now we have become all too familiar with the deadly threat posed by COVID-19. One month ago on February 28, 2020 there were 20 cases of COVID-19 in the United States, and on March 27, at 4pm, there were 97,000 with 1,475 deaths. The United States has more confirmed cases than any other country. Although the outbreak is in earlier stages here in Maine we are still seeing rapid increases in cases over the past week, with 155 confirmed cases on March 26, compared with only 23 cases the week before.[1] The landscape will change just as dramatically in the next week as our doubling time is around 2-3 days and our testing is limited.

The way to protect our community from this highly infectious and deadly disease—which has no vaccine or known cure—is through hand washing and physical distancing. Physical distancing—maintaining 6 feet between people at all times—is impossible in jails and prisons at this time. The single biggest risk to the spread of COVID-19 is crowding, and in prisons and jails COVID-19 can spread like wildfire, endangering prisoners, staff, and the community alike. As a terrible example, the rate of infection of Rikers Island Jail in New York City is *seven times higher* than the city-wide rate, according to the Legal Aid Society.[2] And once such an infection infiltrates a prison or jail, the CDC warns that "[o]ptions for medical

---

[1] *Maine reports 155 coronavirus cases, 'community transmission' in York County*, Portland Press Herald (Mar. 26, 2020); *March 17 live blog: The latest on coronavirus and Maine*, Bangor Daily News (March 17, 2020).

[2] *Coronavirus Update: Rikers Island Rate of Infection 7 Times Higher than Citywide Rate, Legal Aid Says*, CBS New York (Mar. 26, 2020), available at https://newyork.cbslocal.com/2020/03/26/coronavirus-rikers-island/.

isolation of COVID-19 cases are limited."[3] The care of ill prisoners and staff would place a significant additional burden on the health care system.

In such an epidemic, a jail or prison sentence or order for pretrial detention could become a death sentence, especially for individuals over 50 or with chronic health conditions.[4] Prisons and jails are not equipped to treat the vast numbers of prisoners who could be affected, leading to reliance on what will soon be overburdened regional hospitals.[5] These dire risks also extend to the officers who oversee prisoners, the medical providers who treat them, and the broader community—all of whom will be relying on the same hospital beds, respirators, and other health resources.

In light of these concerns, facilities across the country and the world have been releasing inmates who are at high risk of infection or low risk to the community—enabling those individuals to physically distance in the community and reducing the threat to other inmates and facility staff. It is crucial that we take all possible steps to do so. Our immediate handling of risk in our most marginalized communities will dictate the success for the community as a whole.

I lived for two years in Monrovia Liberia working to mitigate and control the ebola epidemic there. Please take this moment, early in the epidemic, to act. Every case in a prison will necessitate the need to quarantine nearly 10-100 people including staff. It will not be possible to keep the virus out. Instead we need to manage space and staff to make a safe-as-possible environment. The public safety

---

[3] Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities, Centers for Disease Control and Prevention, (last updated Mar. 23, 2020), available at https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html.

[4] Coronavirus Disease 2019 (COVID-19) People Who are at Higher Risk, Centers for Disease Control and Prevention, (updated Mar. 26, 2020), available at https://www.cdc.gov/coronavirus/2019-ncov/specific-groups/people-at-higher-risk.html.

[5] See CDC Interim Guidance, *supra* n.3.

mission of the prison system is paramount as we move forward in these difficult times.

Thank you for your consideration and please feel free to contact me if you think I can help.

Sincerely,

Sharon McDonnell BSN MD MPH

Consulting Epidemiologist Maine Medical Center, Portland ME and

Adjunct Faculty Public Health Program, University of New Hampshire

481 Sligo Road, Yarmouth Maine, 04096

207-487-3162